[No. 17809-5-II. Division Two. September 24, 1997.]

*In the Matter of the Marriage of* CHRISTINA L. SWANSON, *Respondent*, and CRAIG A. SWANSON, *Appellant.*

*John E. Thorne,* for appellant.

*Christine O. Gregoire, Attorney General,* and *Kay A. Germiat, Assistant,* for respondent Department of Social and Health Services.

*Larry J. Couture* of *Tuell & Couture, P.S.,* for respondent guardian ad litem.

*Scott A. Candoo,* for respondent Christina L. Swanson.

MORGAN, J. — This appeal requires us to examine, in a case in which a child's paternity is in issue, the roles of the child's guardian ad litem, the other parties, and the trial court. Finding that the guardian and the trial court erred, we reverse and remand.

In March 1983, Christina and Craig Swanson married. In August 1983, Christina bore a child, C. In 1985, Christina told Craig that Craig's former roommate might be C.'s biological father. Four years later, on December 25, 1989, Christina and Craig separated.

In January 1990, Craig filed a petition for dissolution of marriage in which he listed C. as a child of the marriage. He later abandoned the petition, which was dismissed "for inaction."[1]

On May 24, 1991, Christina filed a petition for dissolution of marriage in which she listed C. as a child of the marriage. Craig signed a written joinder form that included, among other things, a waiver of notice of future proceedings.

On February 7, 1992, Christina appeared on the superior court's uncontested dissolution calendar. Craig did not ap-

[1]Report of Proceedings at 4 (Sept. 3, 1993).

pear, not having been notified. The court made various findings, including that Craig was C.'s father, and granted a decree of dissolution from which no one appealed.

On January 20, 1993, Craig moved to vacate "that portion of the Decree of Dissolution of Marriage entered on February 7, 1992, which deals specifically with paternity."[2] Citing CR 60(b)(1) and CR 60(b)(11),[3] he claimed that he had not contested paternity earlier because, after Christina told him C. might not be his child, he wanted to "try to make the best of a bad situation," "stay in the marriage," and "build a 'family.'"[4] His motion was denied by a court commissioner.[5]

On February 22, 1993, Craig moved for revision and blood tests. On March 29, 1993, a superior court judge appointed Genelex Corporation, "an expert in paternity blood testing," to conduct blood tests and render a report.[6] Apparently, the motion for revision was held in abeyance pending Genelex's report.

On April 7, 1993, the State filed a notice of appearance. On May 11, 1993, it moved (a) to intervene; (b) to deny Craig's motion to vacate the judgment of paternity or, in the alternative, to order that blood test results be kept

---

[2]Clerk's Papers at 29.

[3]CR 60(b) provides in part,

[A] court may relieve a party . . . from a final judgment . . . for the following reasons:

(1) Mistakes, inadvertence, surprise, excusable neglect or irregularity in obtaining a judgment or order;

. . . .

(11) Any other reason justifying relief from the operation of the judgment.

[4]Clerk's Papers at 40.

[5]Parenthetically, the commissioner did grant relief as to child support. In Christina's dissolution petition, she had sought child support of $186 per month. In the final decree, however, child support was set at $271 per month. The commissioner granted Craig's motion to reduce child support to $186 per month, and that ruling is not in issue here.

[6]Clerk's Papers at 49, 143.

confidential pending investigation by a guardian ad litem; and (c) to appoint a guardian ad litem.

On May 21, 1993, the trial court granted the motion to intervene, denied the motion to dismiss the motion to vacate, and denied the alternative motion to keep blood test results confidential. It ruled that a guardian ad litem should be appointed and instructed the parties to find one. When the State and Craig each claimed inability to pay a guardian ad litem, the court reserved ruling on how the guardian would be compensated.

On July 2, 1993, the State moved to have an attorney appointed as guardian ad litem. It later explained that it wanted an attorney in the guardian's role "because the issues are legal issues and not social issues."[7] The trial court granted the motion.

Also on July 2, Genelex's report was filed. Dated May 19, 1993, the report stated that blood tests had been "performed according to the criteria outlined in the American Association of Blood Bank Parentage Testing Standards," and that "[b]ased on the scientific evidence," Craig "cannot be the biological father of [C.]."[8]

On July 23, 1993, Christina moved to dismiss Craig's motion to vacate on grounds of untimeliness. On September 3, 1993, the motion was argued at a hearing attended by her, Craig, and the guardian ad litem, but not by the State. Christina contended that "the real aspect of this case, the essence of this case, is really an effort to disestablish parentage."[9] Thus, she said, RCW 26.26.060(1)(b) required Craig to bring his motion "within a reasonable time after obtaining knowledge of relevant facts."[10] Because Craig had knowledge of the relevant facts in 1985,

---

[7]Report of Proceedings at 26 (May 21, 1993).

[8]Clerk's Papers at 50.

[9]Report of Proceedings at 1 (Sept. 3, 1993).

[10]RCW 26.26.060(1)(b) provides, in part, that a man presumed to be a child's father "may bring an action for the purpose of declaring the nonexistence of the father and child relationship only if the action is brought within a reasonable time after obtaining knowledge of relevant facts."

but did not bring his motion to vacate until 1993, she concluded that he had not brought his motion within a reasonable time.

By written memo filed before the hearing, Craig contended that the case was controlled by *State v. Santos*.[11] In effect, he said that the trial court could not deny his motion to vacate without considering the child's due process interest in an accurate determination of paternity.[12]

The guardian ad litem seconded Christina's assertion of untimeliness, *even though he had not yet investigated or analyzed C.'s best interests.* He also asserted that the 1992 dissolution decree was res judicata, and that Craig had not shown a right to relief under CR 60. He told the court:

> I am in somewhat a strange position. I haven't concluded all the investigation I want to do. I was interrupted by [Christina's motion asserting untimeliness]. I didn't want to spend a lot of time and money to continue [the] investigation if you were going to dismiss this motion by Mr. Swanson at some time before it was necessary for me to complete the investigation. So what I am advising the Court is only on the legality as I see it in this situation.[13]

He also said, a few moments later:

> I probably haven't helped you an awful lot in terms of where I am on substantive issues because I haven't a hundred percent made up my mind in that area. I haven't completed the investigation. I don't want to prejudge that. But from a strictly procedural point of view, strictly legal point of view, I think I am compelled to concur with [Christina] the matter is not timely.[14]

Notwithstanding the guardian's failure to investigate,

---

[11]104 Wn.2d 142, 702 P.2d 1179 (1985); Clerk's Papers at 68-74. *See also* Br. of Resp't (State) at 25-26.

[12]For the Supreme Court's most recent references to a child's due process interest in an accurate determination of paternity, *see State v. Fox*, 132 Wn. 2d 346, 937 P.2d 1075, 1079, 1082 (1997).

[13]Report of Proceedings at 4 (Sept. 3, 1993).

[14]Report of Proceedings at 7 (Sept. 3, 1993). *See also* Br. of Resp't (Guardian ad Litem) at 4-5.

analyze and report on C.'s best interests, the trial court denied the motion to vacate. It seems to have based its ruling on the parties' assertions of res judicata and untimeliness, although at one point it said orally that Craig was "estopped" from bringing his motion.[15] Believing that the trial court meant collateral estoppel rather than equitable estoppel,[16] we refer to res judicata, collateral estoppel, and untimeliness[17] as the defenses in issue here.[18]

On October 15, 1993, the trial court entered a final judgment denying the motion to vacate. It ordered Craig to pay $1,150 in guardian ad litem fees, and it permanently enjoined Craig and Christina from discussing C.'s parentage with C. except "in the presence of an independent third party who is acting as a mental health counselor for the benefit of the minor child."[19] The trial court denied reconsideration, and Craig filed this appeal.

Four issues warrant discussion. (1) Did the guardian properly assert, and the trial court properly accept, defenses of res judicata, collateral estoppel, and/or untimeliness? (2) Did Christina and the State properly assert, and the trial court properly accept, defenses of res judicata, collateral estoppel, and/or untimeliness? (3) Did the trial court properly order Craig to pay the guardian ad litem's fee? (4) Did the trial court act properly when it perma-

---

[15]Report of Proceedings at 13 (Sept. 3, 1993).

[16]*See In re Marriage of Stahley*, 71 Wn. App. 794, 796, 862 P.2d 634 (1993) (according to the appellate court, the trial court "concluded Mr. Stahley was estopped from denying paternity of [the child] based on the res judicata effect of the decree of dissolution").

[17]As used here, "untimeliness" means a failure to satisfy the time requirements of RCW 26.26.060(1)(b).

[18]Even if the trial court were referring to equitable estoppel, our analysis would be the same. Like the other defenses mentioned in the text, equitable estoppel blocks an accurate determination of the child's parentage when applied in a case like this.

[19]Clerk's Papers at 77.

nently enjoined Craig and Christina from speaking with C. about C.'s parentage?

## I

The first issue encompasses at least two questions. After a guardian ad litem is properly appointed,[20] must he or she investigate, analyze, and report on the child's best interests before recommending that the trial court apply a defense—for example, res judicata, collateral estoppel, or untimeliness—in such a way as to block an accurate determination of the child's parentage? Concomitantly, must a trial court consider the child's best interests before accepting and applying such a defense? We answer both questions in the affirmative.

When the issue is a child's parentage, "the best interests of the child control."[21] It does not matter whether the action is one to establish or disestablish paternity under RCW 26.26,[22] to obtain a writ of habeas corpus under RCW 7.36,[23] to terminate parental rights under RCW 13.34,[24] to obtain custody under RCW 26.09 or RCW 26.10,[25] or to obtain relief from a final judgment under CR 60.[26]

To ascertain the child's best interests, it will usu-

---

[20]No one assigns error to the trial court's appointment of the guardian ad litem. Hence, we assume throughout this opinion that the appointment was within the trial court's discretion.

[21]*McDaniels v. Carlson*, 108 Wn.2d 299, 309-10, 738 P.2d 254 (1987).

[22]*McDaniels*, 108 Wn.2d at 309-10.

[23]*McDaniels*, 108 Wn.2d at 309-10; *In re Welfare of Becker*, 87 Wn.2d 470, 473-75, 553 P.2d 1339 (1976).

[24]*McDaniels*, 108 Wn.2d at 309-10; *In re Welfare of Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980); *In re Welfare of Sego*, 82 Wn.2d 736, 738, 513 P.2d 831 (1973).

[25]*McDaniels*, 108 Wn.2d at 309-10; *In re Dombrowski*, 41 Wn. App. at 753, 756-57, 705 P.2d 1218 (1985).

[26]Thus, the State says in its brief, "Generally, the underlying principle that governs all actions concerning a child's welfare and well-being is the requirement that the action be in the child's best interests." Br. of Resp't (State) at 30.

ally be necessary to balance the child's constitutional interest in an accurate determination of paternity[27] against the child's interest in maintaining whatever relationship already exists.[28] Thus, the Supreme Court has noted that "[t]he role of a child, in a paternity action, is to seek to maintain or establish a familial bond and protect himself from an erroneous determination of parentage."[29]

██ The child's guardian ad litem, the other parties in the case, and the trial court all play roles in achieving this balance. The role of the guardian ad litem is to investigate the relevant facts concerning the child's situation.[30] He or she analyzes the courses of action available to the trial court, identifies the course or courses that he or she thinks will best serve the child's interests, and makes a report and recommendation to the court concerning those interests.[31] For purposes of any appeal, it is important that the propriety of the guardian's performance show on the record.[32]

█ The role of other parties, who often include the child's parents and the State, is to highlight and comment

---

[27]*Fox,* 132 Wn.2d at 352, 358; *McDaniels,* 108 Wn.2d at 311; *Santos,* 104 Wn.2d at 142, 143-44, 146, 148, 150; *State ex rel. Henderson v. Woods,* 72 Wn. App. 544, 551, 865 P.2d 33 (1994).

[28]*McDaniels,* 108 Wn.2d at 310-12; *Santos,* 104 Wn.2d at 147.

[29]*Santos,* 104 Wn.2d at 147.

[30]*McDaniels,* 108 Wn.2d at 302-03 (guardian appointed by Supreme Court conducted investigation). *See also* RCW 11.88.090(4)(a)-(e); RCW 26.12.175(1)(b); SPR 98.16(c)(1) (guardian investigates in analogous contexts).

[31]*McDaniels,* 108 Wn.2d at 302-03, 312-13; *Hayward v. Hansen,* 97 Wn.2d 614, 620, 647 P.2d 1030 (1982) (trial court may affirm on remand if it enters order approving guardian ad litem's report). *See also* RCW 11.88.090(4)(e), (f)(iv), (f)(v); RCW 11.92.050; RCW 26.12.175(1)(b); SPR 98.16(c)(1), (e) (guardian reports to court in analogous contexts). At oral argument, the guardian contended that a guardian ad litem, once appointed, *is* the child for purposes of the litigation; thus, he said, a guardian can make and implement decisions for the child without court supervision. We reject this contention.

[32]*Woods,* 72 Wn. App. at 550-51. *See also Fox,* 132 Wn.2d at 352, 358; *Hansen,* 97 Wn.2d at 619; *Miller v. Sybouts,* 97 Wn.2d 445, 450-51, 645 P.2d 1082 (1982).

on deficiencies in the guardian's performance.[33] The purpose of such comment is not to benefit the commenting party, although that may be a side effect;[34] rather, the purpose is to benefit the child and assist the trial court. Because the child usually cannot perceive deficiencies in the guardian's performance, and the court cannot conduct its own investigation without going beyond its proper judicial function, such comment and criticism is an important way—and sometimes the only practical way—of unearthing deficiencies in the guardian's performance.[35]

The trial court receives the guardian's report and recommendation, and considers the other parties' comments and criticisms. Then, it "balance[s] the interests of all parties involved, while keeping in mind that the child's interests are paramount."[36] It "is not bound" by the guardian's report or recommendation, but instead must make its own assessment of the child's best interests.[37] When it completes its assessment, it authorizes the guardian to proceed accordingly.

These principles apply with special force when a child has the right to assert a defense, the acceptance and application of which will block an accurate determination of the child's parentage. The mere fact that a defense *can*

---

[33]*Santos*, 104 Wn.2d at 146-47 (putative father pointed out that trial court had failed to appoint guardian ad litem). The Legislature has expressly provided, in an analogous context, that "the parties to the proceeding may file responses to the guardian ad litem report." LAWS OF 1996, ch. 249, § 10(6); RCW 11.88.090(6) (statute governing proceedings to establish a general or limited guardianship). *Cf.* RCW 26.12.175(4) (family court statute allowing party dissatisfied with volunteer guardian ad litem's performance to seek guardian's removal).

[34]The Supreme Court implied as much when it said in *McDaniels v. Carlson*, "[A]bsent a showing that such determination is in fact within the child's best interests, this standard cannot be invoked on behalf of someone other than the child." 108 Wn.2d at 310; *see also State ex rel. Campbell v. Cook*, 86 Wn. App. 761, 938 P.2d 345, 350 (1997).

[35]This paragraph disposes of the respondents' contention, made at oral argument, that Craig is usurping C.'s rights when he claims that the guardian ad litem did not properly perform at the trial court level.

[36]*McDaniels*, 108 Wn.2d at 312.

[37]*McDaniels*, 108 Wn.2d at 312-13.

be asserted does not mean that it *should* be asserted. Whether a defense *can* be asserted is a question of law for the court, at least where a dispute arises. In contrast, whether a defense *should* be asserted is a question of the asserting party's best interests. If the asserting party is a competent adult, he or she assesses those interests, then asserts or waives the defense accordingly. If the asserting party is a child, he or she cannot assess his or her own best interests, and it becomes necessary for the guardian ad litem, the other parties, and the trial court to play their respective roles in assuring that the child's best interests are assessed and served.[38] As noted already, the guardian ad litem initially analyzes the child's best interests and makes a report and recommendation to the court. The other parties offer criticism and comment on the guardian's report and recommendation, if any they have. The trial court determines what course of action is best for the child, and authorizes the guardian to proceed accordingly.

We illustrate using the defenses in issue here. When a guardian ad litem asserts res judicata or collateral estoppel in a case involving a child's paternity, he or she is, in effect, recommending that the finality of a prior judgment be given more weight than the child's need for an accurate determination of parentage. This is proper if the guardian has assessed the child's best interests and believes that finality will further those interests more than an accurate determination of parentage.[39] It is improper, however, if the guardian has failed to assess the child's interests; without such an assessment, the guardian cannot know whether the defense should be asserted or waived, and he or she is not fulfilling his obligation to ascertain and serve the child's best interests.

Likewise, when a guardian ad litem asserts that the issue of paternity is not timely raised under RCW

---

[38]*Santos*, 104 Wn.2d at 147.

[39]*McDaniels*, 108 Wn.2d at 310 (child's best interests do not always require that a paternity determination be made).

26.26.060(1)(b), he or she is, in effect, recommending that staleness be given more weight than the child's need for an accurate determination of parentage. As before, this is proper if the guardian has assessed the child's best interests and the recommendation furthers those interests. It is improper, however, if the guardian has failed to assess the child's best interests; without such an assessment, the guardian cannot know whether the child would better be served by asserting or waiving the defense, and the guardian is again failing to fulfill his obligation to ascertain and serve the child's best interests.

 In this case, the guardian failed to investigate and assess C.'s best interests. He also failed to report to the court on the child's best interests. Neither he nor anyone else produced evidence that might have supplanted a report, and, as far as the record shows, the trial court did not assess the child's best interests before barring an accurate determination of paternity. Because of these failures, it is impossible to know, at this time, whether C. would be better served by waiving the defenses in issue and obtaining an accurate determination of parentage, or by asserting the defenses in issue and requiring Craig to continue in his role as father. The trial court has yet to determine which of these alternatives will serve the child's best interests, and we remand for that to be done.

Nothing we have said means the trial court *must* litigate the issue of paternity on remand. As the Supreme Court has expressly noted, a determination of paternity, "by its very nature, threatens the stability of the child's world."[40] Thus,

> [i]t may be true that a child's interests are generally served by accurate, as opposed to inaccurate or stipulated, paternity determinations. *See Santos*, at 148. However, it is possible that in some circumstances a child's interests will be even better served by no paternity determination at all. . . . The best interests of the child standard does not entitle a court to

[40]*McDaniels*, 108 Wn.2d at 310.

presume that [a] paternity determination is *automatically* in the child's best interest.[41]

On remand, however, the trial court must determine whether confronting or avoiding the issue of paternity will best serve the child's interests, then proceed accordingly.

Nothing we have said means that a trial court must appoint a guardian ad litem every time a party seeks, in untimely fashion, to litigate a child's paternity. On the contrary, we assume that in a case in which res judicata or collateral estoppel would otherwise apply, the trial court must appoint a guardian only when the movant, by affidavit or otherwise, makes an appropriate threshhold showing. The exact nature of this threshhold showing is not in issue here, where no one assigns error to the trial court's order appointing a guardian ad litem.

Finally, our recent opinion in *State ex rel. Campbell v. Cook*, 86 Wn. App. 761, 938 P.2d 345 (1997), illustrates the process that should have been used here, once a guardian ad litem had been properly appointed. In *Campbell*, the alleged father sought relief under CR 60 from an earlier, nonappealed judgment establishing paternity. The trial court appointed a guardian ad litem "to investigate the situation and to recommend whether [the requested relief] was in the 'best interests of the child.' "[42] The guardian investigated and filed a report "strongly recommend[ing]" that the requested relief be denied.[43] "The trial court examined the GAL report and the particular facts of the case, then balanced the interests of all parties involved, while ensuring that [the child's] best interests were paramount."[44] It then concluded that granting the re-

---

[41]*McDaniels*, 108 Wn.2d at 310.

[42]86 Wn. App. at 765.

[43]86 Wn. App. at 765.

[44]86 Wn. App. at 770.

quested relief "would not be in the 'best interests of the child.' "[45] We affirmed, holding that the trial court had not abused its discretion.

## II

The next issue is whether the mother and the State properly asserted, and the trial court properly accepted, the defenses of res judicata, collateral estoppel, and/or untimeliness. For reasons expressed in the footnote, we agree with them that they established the elements of those defenses.[46] This, however, is not enough.

When a child's paternity is in dispute, the child, the parents and the State all have rights.[47] When those rights conflict, however, "the rights of the child should prevail."[48] For this reason, a trial court's duty is to "balance the interests of all parties involved, while keeping in mind that the child's interests are paramount."[49]

In this case, the mother and the State are entitled to assert, and to have the trial court accept and apply, defenses of res judicata, collateral estoppel and untimeliness—

---

[45]86 Wn. App. at 770.

[46]Christina and the State established the elements of res judicata and/or collateral estoppel because the 1992 dissolution decree became final when not appealed, and Craig has not shown a right to relief under CR 60. *See Johns v. Johns*, 64 Wn.2d 696, 700, 393 P.2d 948 (1964); *Marriage of Stahley*, 71 Wn. App. at 796-97. We assume but do not hold that they established the elements of untimeliness because Craig knew in 1985 that he might not be the biological father, yet failed to bring his motion until 1993. *See Miller*, 97 Wn.2d at 449; *In re Paternity of K.*, 51 Wn. App. 131, 135, 752 P.2d 393 (1988).

[47]*McDaniels*, 108 Wn.2d at 311.

[48]*McDaniels*, 108 Wn.2d at 311.

[49]*McDaniels*, 108 Wn.2d at 312. The State acknowledges this hierarchy, though only with respect to the rights of the parents. It says in its brief, "[C]ourts have recognized that the rights of parents are given great weight, but when there is a conflict, the rights of the parent must yield to the child's best interests." Br. of Resp't (State) at 31. In *McDaniels*, 108 Wn.2d at 311, the Supreme Court said that the same hierarchy affects the rights of the State.

*subject to the best interests of the child.*[50] If the trial court finds after remand that these defenses are consistent with the child's best interests, it shall apply them. If the trial court finds after remand that these defenses are inconsistent with the child's best interests, it shall decline to apply them, for in that event the child's constitutional due process interest in an accurate determination of parentage[51] takes precedence over common-law defenses such as res judicata and collateral estoppel, and over a statutory defense such as untimeliness.

## III

The third issue is whether the trial court properly ordered the father to pay the guardian ad litem's fee. The guardian and the trial court misperceived the guardian's role in the case, and it seems likely that the guardian may have claimed, and the trial court may have awarded, fees not reasonably related to assessing and asserting the child's best interests. As a result, we vacate the fee order, but we also provide that on remand, the trial court shall have discretion to award or re-award fees for work that preceded the taking of this appeal.[52] Before making an award, the trial court must find that the work underlying the fees was reasonably necessary to assess and assert the best interests of the child.

## IV

The last issue is whether the trial court properly enjoined Craig and Christina from speaking with C. about C.'s parentage. A trial court may issue an injunction when the claimant shows a clear legal or equitable right, a well-grounded fear that the right will immediately

---

[50]*McDaniels*, 108 Wn.2d at 313 (" 'where the welfare of a child is involved, the best interest of the child *may* mandate that the court proceed on the matter in spite of facts warranting an estoppel.' ") (quoting *Ettore I. v. Angela D.*, 129 Misc. 2d 301, 305, 492 N.Y.S.2d 1013 (Fam. Ct. 1985)).

[51]*Fox*, 132 Wn.2d at 352, 358; *McDaniels*, 108 Wn.2d at 311; *Santos*, 104 Wn.2d at 143-44, 146, 148, 150; *Woods*, 72 Wn. App. at 551.

[52]*In re Marriage of T*, 68 Wn. App. 329, 334, 842 P.2d 1010 (1993).

be invaded, and the prospect of actual and substantial injury.[53] At least the third element is not met here, for nothing in the record shows that C. was unaware of her parentage at the time the injunction issued.[54] Additionally, nothing explains why a *permanent* injunction is reasonable under these circumstances—in other words, why a parent should be enjoined from discussing a child's parentage even after the child becomes an adult. The injunction issued here was clearly improper.

 The guardian claims fees and costs on appeal. We deny the claim because, in our view, this appeal was necessitated in significant part by the guardian's misunderstanding of his role at the trial court level. We do not restrict the trial court's discretion to award fees for future work done in the trial court, provided, of course, that the work is reasonably related to assessing and asserting the best interests of the child.

The case is reversed and remanded with directions to assess and effectuate the best interests of the child. Each party shall bear its own fees and costs incurred on appeal.[55]

ARMSTRONG, J., concurs.

---

[53]*Malyon v. Pierce County*, 131 Wn.2d 779, 935 P.2d 1272, 1289 (1997); *King v. Riveland*, 125 Wn.2d 500, 515, 886 P.2d 160 (1994); *Isthmian S.S. Co. v. National Marine Eng'rs Beneficial Ass'n*, 41 Wn.2d 106, 117, 247 P.2d 549 (1952).

[54]On the contrary, the record indicates that C. was aware. Craig told the trial court: "Your Honor, I want to state that the mother has talked to the child and has told her the truth that I am not her father. I have talked to the child. The child is fine." Report of Proceedings at 6 (May 21, 1993). The trial court responded by observing that it had recently received an ex parte letter from the mother which seemed to imply that C. was aware. Consistently, the guardian states in his brief on appeal that "[n]othing in this case indicates that the minor child was not made aware of a parentage issue." Br. of Resp't (Guardian ad Litem) at 7.

[55]One of the dissent's premises, *sub silentio* at least, is that the trial court *wrongfully* appointed a guardian ad litem in the first instance. The dissent says that "a guardian was not necessary" (Dissent at 147), and that this court should not deny the trial court "the discretion to terminate the services of a guardian who was appointed *without a threshold showing* that the appointment was in the child's best interest." Dissent at 147 (emphasis added).

The dissent's premise is flawed because no one assigns error to, or otherwise challenges, the order appointing a guardian ad litem in the first instance. *The*

SEINFELD, J. (dissenting) — I respectfully dissent. Because Craig Swanson, C's presumed father, failed to make any showing that disestablishment was in C's best interest, the trial court did not err in dismissing this case

Generally, "a man alleged . . . to be the father . . . may bring an action at any time for the purpose of declaring the . . . nonexistence of the father and child relationship." RCW 26.26.060(1)(a). But RCW 26.26.060(1)(b) provides that a *presumed father* may bring such an action "only if the action is brought within a reasonable time after obtaining knowledge of relevant facts."

By imposing a "reasonable time" requirement, the Legislature has recognized that a presumed father's untimely effort to disestablish his relationship with his child generally is not in the child's best interest. There are detrimental consequences — financial, social, and psychological — associated with the probing involved in a disestablishment action and there are repercussions attached to a declaration of illegitimacy. *See Pierson v. Pier-*

*State* moved for a guardian ad ltem, and it does not now complain that its motion was granted. Christina has never opposed a guardian ad litem. In the trial court, Craig initially made an oral, one-sentence objection to the appointment of a guardian ad litem, Report of Proceedings at 4:8-9 (May 21, 1993), but he and all other parties later *stipulated in writing* that a guardian should be appointed. Clerk's Papers at 167-68. Since then, Craig has argued only that he should not have *to pay for* the guardian. Report of Proceedings at 7-8 (July 21, 1993). Given that the trial court's order appointing the guardian is not challenged on appeal, this court is obligated to work not from a premise that the guardian was *wrongfully* appointed, but rather from a premise that the guardian ad litem was *rightfully* appointed.

The dissent's premise is also flawed because, in saying that "a guardian was not necessary," the dissent is either (a) substituting its discretion for the trial court's, or (b) holding that the trial court lacked discretion to appoint a guardian ad litem in the first instance. Neither proposition is tenable.

Because the dissent reasons from the wrong premise, it focuses on the wrong question. The question, it implicitly asserts, is whether a trial court has "the discretion to terminate the services of a guardian who was appointed *without a threshold showing* that the appointment was in the child's best interest." Dissent at 147 (emphasis added). If we reason from the correct premise, however (in other words, if we reason from the premise that the guardian was *rightfully and properly* appointed), we see that the true question is whether a guardian ad litem, having been rightfully and properly appointed, is entitled to make a motion that would bar an accurate determination of the child's parentage, without first investigating and ascertaining the child's best interests. The answer to that question is no, for all the reasons stated in the text.

*son,* 124 Wash. 319, 321, 214 P. 159 (1923) ("A court will not by its judgment brand an innocent child with the bar sinister unless the record is so far conclusive as to leave room for no other course.")[56]

The difficult question before this court is how to reconcile the competing policies supporting the presumption that a child born during wedlock is a child of the marriage and the general assumption that it is in a child's best interest to know the identity of its biological father. As the majority agrees, RCW 26.26.060(1)(b) suggests that the trial court is not *required* to subject a child to a guardian's investigation unless the dilatory presumptive father first makes a threshold showing that the action is in the child's best interest.

Nothing in the record here indicates that Craig's diss-

---

[56]The United States Supreme Court traced the historic policies underlying the presumption of parentage in *Michael H. v. Gerald D.*, 491 U.S. 110, 124-25, 109 S. Ct. 2333, 105 L. Ed. 2d 91 (1989):

The presumption of legitimacy was a fundamental principle of the common law. H. Nicholas, Adulturine Bastardy 1 (1836). Traditionally, that presumption could be rebutted only by proof that a husband was incapable of procreation or had had no access to his wife during the relevant period. *Id.*, at 9-10 (citing Bracton, De Legibus et Consuetudinibus Angliae, bk. i, ch. 9, p. 6; bk. ii, ch. 29, p. 63, ch. 32, p. 70 (1569)). As explained by Blackstone, nonaccess could only be proved "if the husband be out of the kingdom of England (or, as the law somewhat loosely phrases it, *extra quatuor maria* [beyond the four seas] ) for above nine months. . . ." 1 Blackstone's Commentaries 456 (J. Chitty ed. 1826). And, under the common law both in England and here, "neither husband nor wife [could] be a witness to prove access or nonaccess." J. Schouler, Law of the Domestic Relations § 225, p. 306 (3d ed. 1882); R. Graveson & F. Crane, A Century of Family Law: 1857-1957, p. 158 (1957). The primary policy rationale underlying the common law's severe restrictions on rebuttal of the presumption appears to have been an aversion to declaring children illegitimate, see Schouler, *supra*, § 225, at 306-307; M. Grossberg, Governing the Hearth 201 (1985), thereby depriving them of rights of inheritance and succession, 2 J. Kent, Commentaries on American Law 175, and likely making them wards of the state. A secondary policy concern was the interest in promoting the "peace and tranquillity of States and families," Schouler, *supra*, § 225, at 304, quoting Boullenois, Traite des Status, bk. 1, p. 62, a goal that is obviously impaired by facilitating suits against husband and wife asserting that their children are illegitimate. Even though, as bastardy laws became less harsh, "[j]udges in both [England and the United States] gradually widened the acceptable range of evidence that could be offered by spouses, and placed restraints on the 'four seas rule' . . . [,] the law retained a strong bias against ruling the children of married women illegitimate." Grossberg, *supra*, at 202.

establishment action would aid C in knowing who her biological father is or benefit her in any way. Further, as Craig argues in his appellate briefs, he initially even opposed the appointment of a guardian, contending that there was no need for one. (Opening Br. at 6; Reply Br. at 16; RP at 4:8-9 (May 21, 1993)) Craig was correct; absent a prima facie showing of best interest, a guardian was not necessary.

Nonetheless, once appointed, the guardian did not, as the majority states, "fail[ ] to investigate and assess C's best interests." Rather, he saw his role as exploring all issues. But his comments to the trial court indicate a sensitivity to the financial burden of a full social investigation and an effort to avoid incurring unnecessary expenses.

Midway through the investigation, the trial court determined that it was possible to decide the case as a matter of law without a complete guardian's report. Under the facts of this case, I believe the trial court had the discretion to make this decision. As the majority acknowledges, "the trial court must appoint a guardian only when the movant, by affidavit or otherwise, makes an appropriate threshold showing." I see no logical reason to grant the trial court discretion to decline to appoint a guardian initially, but to deny it the discretion to terminate the services of a guardian who was appointed without a threshold showing that the appointment was in the child's best interest. I believe the majority's opinion unnecessarily limits trial court discretion and does a disservice to the parties.

Further, relying upon the rubric, "child's best interest," the majority would disregard the timeliness conditions set forth in RCW 26.26.060(1)(b). Of even greater concern, it would require the trial court to act in a way that is likely to be contrary to the child's best interest. The majority's remand will subject C to the guardian's probing questions that by themselves can cause irreversible damage to a child's life.

Finally, the facts in the cases cited by the majority are distinguishable. We do not have two men competing to be the father as in *McDaniels v. Carlson,* 108 Wn.2d 299, 738 P.2d 254 (1987), and we do not have a putative father who had an affair with a married woman as in *State v. Santos,* 104 Wn.2d 142, 702 P.2d 1179, 70 A.L.R.4th 1021 (1985). Nor do we have an alleged father as in *State ex rel. Campbell v. Cook,* 86 Wn. App. 761, 938 P.2d 345 (1997). Nor would Craig's success in disestablishing paternity produce an accurate determination of paternity for C. It would merely remove from C the only father she has ever known. These are the facts suggested by the *McDaniels* court when it acknowledged that "in some circumstances a child's interest will be even better served by no paternity determination at all." 108 Wn.2d at 310.

In sum, under the facts of this case, Craig's biological evidence of nonpaternity should not be sufficient to challenge the presumption of legal paternity. In light of the State's interest in preserving the father-child relationship of a child born during wedlock and of Craig's voluntary acceptance of the parental role for almost 10 years, he should not now be allowed to disclaim C, leaving her fatherless, financially and emotionally. For the above reasons, I would affirm the trial court's order of dismissal.

Review denied at 134 Wn.2d 1004 (1998).